**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROBERT L. ADAMS, JR.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  23-2142** |
| | : | |
| **SUPERINTENDENT METELLUS**, *et al.* | : | |

<u>**MEMORANDUM**</u>

**MURPHY, J.**                                                            **November 13, 2025**

Robert Adams's pleadings in this case paint a grim picture of his time as a prisoner at Bucks County Correctional Facility (BCCF).  Cells and mattresses covered in urine and feces. Dirty clothing.  Food infused with tobacco juice and spit.  No hot water; sometimes, no shower at all.  Physically and verbally abusive prison staff.  Humiliating strip searches; constant 3:00 a.m. cell searches.  Unanswered pleas for medical help.  Pressure to stop treatment.  No access to a lawyer or legal resources.  It took some time for this case to reach this stage, in part because of the large number of named defendants and in part because prison authorities moved Mr. Adams several times.  Today, we address Mr. Adams's claims against BCCF staff for the conduct and conditions that he allegedly faced while at BCCF and decide whether, pursuant to defendants' motions, to dismiss them.  We grant in full the motion to dismiss filed by PrimeCare Medical, Inc. (PrimeCare) and Dr. Victoria Gessner.  DI 88.  As for the motion to dismiss filed by the Individual County Defendants (DI 83), in which we permit the joinder of the other BCCF defendants (DI 86), we grant it in part and deny it in part.

I.        **FACTUAL BACKGROUND**

Mr. Adams brings several claims against various individual defendants in this case.[1]

---

[1] We previously dismissed Mr. Adams's claims against BCCF, Bucks County Medical

Against all defendants, he alleges federal violations concerning (1) the Americans with Disabilities Act (ADA); (2) the Rehabilitation Act; (3) the First Amendment freedoms of speech and association; (4) the Fourth Amendment with respect to unlawful search and seizure; (5) the Sixth Amendment right to counsel; (6) the Eighth Amendment; (7) the Fourteenth Amendment with respect to equal protection and due process; and (8) a conspiracy to violate his rights.  DI 40 at 49-52, 61-63.  He also claims that all defendants harassed him.  *Id.* at 61-63.  Against different groups of defendants, Mr. Adams alleges (1) excessive force;[2] (2) inadequate medical care;[3] (3)

---

Department, Bucks County Correctional Administration, and Bucks County Policy Makers.  DI 46.

[2] Mr. Adams asserts this claim against Lieutenant Kyle Wylie, Sergeants Andrew Beck and Nicholas Murphy, Corrections Officers Michael Schuster, Craig Geibert, Mario Hernandez, Kevin South, John Doe #1, and John Doe #2.  *Id.* at 59-61.

[3] Mr. Adams asserts these claims against Superintendent Carl Metellus, Deputy Superintendent Kelly Reed, Lieutenant Wylie, Sergeants Murphy and Anthony Cruz, Dr. Gessner, Nurse Jamie, Nurse Enna, Chief Medical Administrator Brian Norfleet, and PrimeCare. *Id.* at 49-50.

deliberate indifference;[4] (4) professional negligence;[5] and (5) defamation.[6]

Mr. Adams was incarcerated at BCCF over the course of approximately nine months between October 2022 and June 2023.  DI 40 at 14.  He asserts that, on November 1, 2022, BCCF staff "deliberately and intentionally caused [him] to be [m]aliciously hurt and assaulted by another inmate, who broke into [his] locked cell where he was housed, after telling the [c]orrectional officer he was going to assault [Mr. Adams]."  *Id.* at 21.  Mr. Adams avers that BCCF staff denied him safety, security, and equal protection under the law "by deliberately neglecting to fix the faulty locking mechanisms within the doors of the cells for years."  *Id.* According to Mr. Adams, after Corrections Officer Simpson loudly called Mr. Adams a rat and a snitch, the officer enabled an individual referred to as "inmate [B]oiling" — who explicitly threatened Mr. Adams in front of the officer and was known to tamper with cell door locks — to pick the lock of Mr. Adams's cell and assault him.[7]  *Id.* at ¶¶ 68-82.  Mr. Adams claims that this

---

[4] Mr. Adams asserts these claims against PrimeCare, Dr. Gessner, Nurse Jamie, Nurse Enna, Mr. Norfleet, Superintendent Metellus, Deputy Superintendent Reed, Deputy Superintendent Jeffrey Contino, Captain James Nottingham, Lieutenants Wylie, Mark Clayton, Joseph Whitesell, Christopher Hugg, and Andrew Kovach, Sergeants Murphy, Anthony Cruz, Karol Kinkelin, Beck, Noelia Cruz, Christopher O'Donnell, Ronald Grous, Michael Raggi, and Kevin Jurgelewicz, and Corrections Officers George Simpson, Frank Williams, and Jeffrey Clarke.  *Id.* at 49-50, 52-58.

[5] Mr. Adams asserts these claims against Superintendent Metellus, Deputy Superintendents Reed and Contino, Captain Nottingham, Lieutenants Whitesell, Hugg, Clayton, Kovach, Wylie, Sergeants Murphy, Kinkelin, Anthony Cruz, Noelia Cruz, O'Donnell, Grous, Beck, Raggi, and Jurgelewicz, Corrections Officers Simpson and Williams, PrimeCare, Dr. Gessner, Mr. Norfleet, Nurse Jamie, and Nurse Enna.  *Id.* at 52-55.

[6] Mr. Adams asserts this claim against Sergeant Noelia Cruz and Corrections Officers Williams, Simpson, and Clarke.  *Id.* at 55-58.

[7] After this incident, Mr. Adams claims he told Sergeant Anthony Cruz that inmate

incident led to retaliation against him by BCCF staff across the facility, which included (1) various violations related to sexual, racial, disability, medical, and religious-based harassment and discrimination; (2) physical and verbal assaults; (3) threats of physical violence; (4) repeated excessive searches of his cell, particularly at 3:00 a.m. when he took his suboxone and disability medication; (5) interference with his legal mail and right to legal research and access; (6) the forgery of legal documents; (7) the denial of visits; (8) the denial of due process related to a preliminary hearing for his alleged misconduct; (9) exposure to egregiously unsanitary and uninhabitable conditions; (10) poisoning by the nursing staff; (11) tampering with his food; (12) unnecessary and humiliating strip searches; (13) torture; and (14) attempted murder.  *Id.* at 21-22; ¶¶ 203, 215.

Mr. Adams alleges specific conduct by Sergeant Kinkelin;[8] Corrections Officer

---

Boiling attacked him and then asked to be checked out by medical and receive a rape kit examination.  *Id.* at ¶ 77.  He asserts that Sergeant Cruz denied him medical treatment.  *Id.*
    [8] *Id.* at ¶ 119 (alleging she intentionally moved Mr. Adams into a cell covered in feces and urine and threatened him if he did not move there).

Williams;[9] Corrections Officer South;[10] Corrections Officer Schuster;[11] John Doe #1;[12] Sergeant

Beck, Corrections Officer Geibert, and John Doe #2;[13] Corrections Officer Mark Gray;[14]

---

[9] *Id.* at ¶¶ 86-90, 94-95, 97-101, 110 (alleging Corrections Officer Williams (1) called him racial, homophobic, and religious slurs; (2) threatened to shoot him or otherwise physically harm him; (3) threatened to have sex with his wife in front of his son; (4) threatened to shoot his son (5) sexually harassed him; (6) called him a rat; (7) defiled his property; and (8) told him to commit suicide).

[10] *Id.* at ¶¶ 105, 249-253 (alleging Corrections Officer South (1) head-butted him while he was in a defenseless position on the ground; and (2) participated in a surprise preliminary hearing charging Mr. Adams with aggravated assault and other charges, without the presence of Mr. Adams or his lawyer, and falsely claimed Mr. Adams waived his preliminary hearing). Mr. Adams insists that he never waived his right to be present at a preliminary hearing. *Id.* at ¶ 253. As a result of Officer South's alleged attack, which also included Corrections Officer Schuster and several other officers, Mr. Adams asserts that his left eye was burning, his vision was blurry, and he was struggling to breathe through his nose, which was severely painful. *Id.* at ¶ 108.

[11] *Id.* at ¶ 106 (alleging Corrections Officer Schuster kneed him in the head, tearing the skin from his temple, while he was lying in a defenseless position).

[12] *Id.* (alleging John Doe #1 punched him in the face twice, while he was lying in a defenseless position).

[13] *Id.* at ¶¶ 111-14 (alleging they aggressively slammed him on the hard bed and put leg irons on him, where the mattress was soaked with urine and covered in feces, and punched him in the head, and claiming Sergeant Beck and Corrections Officer Geibert grabbed him through the tray slot in a manner that caused him to hyperextend his arms and shoulders). He also claims that Corrections Officer Geibert kicked him in the face. *Id.* at ¶ 114. As a result, Mr. Adams avers that his elbow and hands hurt, his shoulder felt out of place, he had deeply embedded cuff marks on his wrist, he could not breathe out of his nose, and he had blurry vision. *Id.* at 115. Mr. Adams asserts that approximately one week later, he was taken to Doylestown Hospital, where he discovered he was dehydrated and had torn ligaments in his right hand and right shoulder, a nose fracture, a concussion, and an infection. *Id.* at ¶ 134. At another point, Mr. Adams claims that Sergeant Beck harassed, taunted, and cursed at him while he was taking his medication. *Id.* at ¶ 157.

[14] *Id.* at ¶ 116 (alleging Corrections Officer Gray spit into his food).

Sergeant O'Donnell and Corrections Officers Dylan Swan and Gregory Black;[15] Lieutenant

Wylie, Sergeant Murphy, and Nurse Jamie;[16] Corrections Officer Donald Connor;[17] Lieutenant

---

[15] *Id.* at ¶ 118 (alleging they "toyed with" Mr. Adams by acting as if they were going to give him the shower he was begging for and humiliated him in front of other inmates). Mr. Adams also claims that Sergeant O'Donnell and Corrections Officer Black denied him a shower on November 30, 2022, and that Sergeant O'Donnell and Corrections Officer Swan humiliated him in front of other inmates by denying him cups of warm water for washing himself. *Id.* at ¶ 147. In early January 2023, Mr. Adams claims that Sergeant O'Donnell tried to force Mr. Adams to move into a cell which had urine and feces in it. *Id.* at ¶ 154.

[16] *Id.* at ¶ 121 (alleging they violently slammed him on a stretcher while he was handcuffed behind his back, causing him pain); *see also id.* at ¶ 123 (claiming Lieutenant Wylie did not replace a mattress for Mr. Adams after removing it). Mr. Adams also asserts that Nurse Jamie was deliberately indifferent toward his medical needs when he issued a medical order to take away Mr. Adams's warm blankets and clothing, causing him to freeze in his cell. *Id.* at ¶¶ 127, 129. Additionally, Mr. Adams asserts that Lieutenant Wylie and Sergeant Murphy twice unnecessarily stripped him naked and left him exposed to other inmates to humiliate and degrade him. *Id.* at ¶¶ 128, 135.

[17] *Id.* at ¶ 126 (asserting that, upon complaining to Corrections Officer Connor that his food was saturated with tobacco spit and pieces of chewed tobacco, the officer replied "You['re] lucky it[']s just tobacco juice."). Mr. Adams claims that Corrections Officer Connor and Corrections Officer Jeremy New would deliver him food that was un-eatable and tampered with — once including a food tray with a piece of used toilet paper in it. *Id.* at ¶¶ 226-27.

Clayton;[18] Lieutenant Hugg;[19] Corrections Officer Bruce Butler;[20] Corrections Officer Clarke;[21]

Sergeant Noelia Cruz;[22] Lieutenant Kinkelin, Sergeants Anthony Cruz, Noelia Cruz,

---

[18] *Id.* at ¶ 131 (claiming he denied him the ability to obtain a grievance form).  Mr. Adams also asserts that Lieutenant Clayton knowingly let Mr. Adams use a mattress soaked with urine and covered in feces and merely laughed when he complained about his food being tampered with.  *Id.* at ¶¶ 149, 227.  In response to Mr. Adams expressing that the white inmates on the suboxone program are never searched in the morning nor brought outside of their cells and shackled like him, Lieutenant Clayton smiled and said, "Sucks to be you." *Id.* at ¶ 214.  Mr. Adams states that inmates Anderson and Morning (who are white) and Mikhael are not searched despite their status in the restricted housing unit (RHU), mental health unit (MHU), or suboxone use.  *Id.* at ¶¶ 215, 256.  He also claims that inmates Anderson and Morning were quickly moved out of the MHU because they were on RHU status.  *Id.* at ¶ 215.  And he likewise avers that he was denied the ability to press charges against an inmate who spit in his face, yet a white inmate (inmate David Gentile) was allowed to press charges against him when he vomited on Gentile. *Id.* at ¶ 216.  Mr. Adams also asserts that he was transferred to George W. Hill Correctional Facility to prevent him from filing grievances and lawsuits against BCCF.  *Id.*

[19] *Id.* at ¶¶ 140, 142 (alleging Lieutenant Hugg opened his legal mail outside of his presence, searched it, and removed legal material before providing the mail to Mr. Adams).

[20] *Id.* at ¶ 150 (claiming Corrections Officer Butler laughed at and taunted Mr. Adams before giving him cleaning supplies with which to clean his mattress, but refused to provide him certain supplies).

[21] *Id.* at ¶¶ 156-57, 171, 200 (asserting Corrections Officer Clarke ransacked his cell when he searched it multiple times, called Mr. Adams homophobic slurs and a rat, and threatened Mr. Adams with physical violence — including a threat to break Mr. Adams's neck).

[22] *Id.* at ¶¶ 156, 159-60, 167-68, 174-75, 182, 198, 200, 203, 207, 209, 212, 215, 223, 242 (claiming Sergeant Noelia Cruz stood over Mr. Adams aggressively, told him to "shut the fuck up[,]" failed to stop the abusive conduct of Corrections Officer Clarke, made fun of his naked body during a strip search, and frequently searched his cell at 3:00 a.m., sometimes ransacking it).  When he complained to her about Corrections Officer Joseph Bromiley reading his legal paperwork, Mr. Adams claims she responded, "We can read everything in that cell and go through whatever the fuck we want. That's what I hate about you Faggets, y'all fuckin' whine to[o] much." *Id.* at ¶ 210.  On May 29, 2023, he alleges she and Corrections Officer William Labadie allowed Corrections Officer Carulli to read his legal mail.  *Id.* at ¶ 231.  He also claims that Corrections Officer Robert Keefe removed legal documents — which he states were branded with the Bucks County logo — from Mr. Adams's legal material once he was transferred back to

Jurgelewicz, and Anthony Hodges, and Corrections Officers Geibert, William Miles, Philip

Smythe, Antwine Faggins, Joseph Polichetti, Aaron Mayers, Hunter Barnett, Gray, and Steven

Glenn;[23] Lieutenant Hugg, Sergeant Noelia Cruz, and Corrections Officers Ricardo Romana,

Jacob Kasprzyk, Eric Harrison, Janett Roque, Labadie, Bromiley, Sean Hordijenko, and Aaron

---

BCCF from George W. Hill Correctional Facility, which Mr. Adams contends he needed for his parole hearing.  *Id.* at ¶ 237.

[23] *Id.* at ¶¶ 160, 163-64, 166, 173, 181, 191, 193, 196, 206-07, 215, 217, 221-22, 224, 240, 246, 248, 257 (alleging that the officers searched Mr. Adams's cell and that, during one search by Corrections Officer Smythe, the officer told Mr. Adams that he should be silent and file whatever paperwork he was going to file because his cell would get searched).  Mr. Adams also claims that, on a separate occasion, Corrections Officer Smythe destroyed his cell during a search.  *Id.* at ¶ 187.  After Corrections Officer Polichetti quickly searched Mr. Adams's cell, Mr. Adams claims the officer said to Sergeant O'Donnell, "[Y]ou told me to give it its normal fucking up" to which Sergeant O'Donnell replied, "You wasn't suppose[d] to say that in front of him."  *Id.* at ¶ 191.  Mr. Adams also avers that, unlike inmates like inmate Anderson, he is removed from his cell and made to take his medication outside his cell while the search is conducted.  *Id.* at ¶¶ 196-97.  He claims that, on numerous occasions, Sergeant Noelia Cruz, Sergeant O'Donnell, and Corrections Officer Smythe told him to stop taking his suboxone medication if he wanted to avoid the cell searches, and that BCCF staff's efforts to prevent him from taking his medication came from Captain Nottingham's orders.  *Id.* at ¶ 204.

McFadden;[24] Nurse Enna;[25] Hearing Officer Richard Dittman;[26] Corrections Officer

McFadden;[27] Corrections Officer Hernandez;[28] and Lieutenant Kovach.[29]  He also asserts that he

---

[24] *Id.* at ¶¶ 161-62, 165, 169-70, 172, 177, 182, 186-87, 196, 198, 200, 203, 205, 210-12, 228, 231, 242, 247 (claiming they destroyed his cell while searching it).  Mr. Adams also avers that Corrections Officer Harrison twice read his legal mail during his searches of Mr. Adams's cell, which Sergeant Kinkelin witnessed.  *Id.* at ¶¶ 176, 238.  He also states that Corrections Officer Brian Mattoi searched his cell one day, leaving his legal work strewn about on his bed frame.  *Id.* at ¶ 239.  Mr. Adams insists that he notified superiors that his cell was deliberately searched every morning at 3:00 a.m., while other cells were not searched, including a specific request slip to Captain Nottingham on May 18, 2023.  *Id.* at ¶ 203.  He claims that, after Sergeant Kinkelin ordered a quick pass-over search of his cell, she stated, "You know I don't try to fuck your stuff up like other officers. I know the searching is a bit much but, [i]f you stop taking these [suboxones] – we won't go into your cell."  *Id.* at ¶ 208.  Mr. Adams also asserts that Sergeant Grous ordered Corrections Officer Simpson to search his cell a second time, while Mr. Adams was in court, to harass him.  *Id.* at ¶ 220.

Separately, Mr. Adams avers that Corrections Officer Bromiley told him, "We are going to hang you the first chance we get you off camera. You's a monkey that should be tarred and feather[ed]. . . . Don't sleep to[o] hard boy! When the power goes out so does the cameras and then, you'll be another inmate written off as a suicide."  *Id.* at ¶ 213.

[25] *Id.* at ¶ 183-85, 192, 225 (claiming she was deliberately poisoning him with different medication than what he is prescribed since November 2022, that she stopped giving him his medication for a few weeks after he submitted a complaint about the poisoning, and that she aggressively shoved medication in his face).

[26] *Id.* at ¶¶ 190, 218 (averring he sentenced Mr. Adams for alleged misconduct without a hearing and without asking if Mr. Adams wanted to participate in a hearing).

[27] *Id.* at ¶ 228 (claiming that he ransacked Mr. Adams's cell and placed handcuffs on him extremely tightly).

[28] *Id.* at ¶ 243 (claiming the officer used excessive force when putting leg irons on his swollen ankles and legs, forcefully bending his legs upwards, and using great strength to pull the leg iron upward — ultimately cutting Mr. Adams — after which Sergeant Noelia Cruz took the shackle out of Officer Hernandez's hand).

[29] *Id.* at ¶ 244 (alleging that, in response to asking Lieutenant Kovach if he could stop the searches of his cell every morning, he stated, "No! I will search[] you[r] cell every single day so long as you['re] in this prison. You forget what you did to my officer? You'[re] lucky all I'm

notified (1) Deputy Superintendent Reed of abuse by BCCF staff, his lack of access to the law

library, the uninhabitable conditions in his cell, inadequate medical care, and tampered-with

food; (2) Superintendent Metellus of the incident with Corrections Officer Simpson and inmate

Boiling; (3) Captain Nottingham, Lieutenants Wylie, Hugg, and Whitesell, and Sergeants

Murphy, Raggi, Beck, Noelia Cruz, Anthony Cruz, O'Donnell, Grous, and Kinkelin of the

uninhabitable conditions in the mental health unit (MHU);[30] and (4) Superintendent Metellus,

Deputy Superintendents Reed and Contino, Captain Nottingham,[31] and Lieutenant Clayton about

the deliberate indifference toward his serious medical needs and the denial of his request for

bloodwork to identify the substance with which Nurse Enna was allegedly poisoning him. *Id.* at

¶¶ 91-93, 97, 118, 131, 137, 139, 201, 227.

---

doing is searching."). Lieutenant Kovach was apparently referring to Mr. Adams's assault of
Corrections Officers Williams and/or South, during which Mr. Adams allegedly ran toward
Officer Williams with a metal pole, pushed the officer off him "sumo style," and got in an
altercation with Corrections Officer South. *Id.* at ¶¶ 102-05. Captain Nottingham allegedly used
this incident as a basis for ignoring Mr. Adams's grievances, as Mr. Adams contends that he
stated he was not responding to those grievances and explained, "Because I'm not going to help
you so stop writing me. Write someone else. You assault one of my officers. Why the fuck
would I help you. I blocked your phone, I blocked you on the tablet and I blocked you from
commissary. You['re] lucky I couldn't keep you from getting RHU commissary. So stop fucking
writing me." *Id.* at ¶ 245.

[30] Mr. Adams specifically alleges that (1) his various MHU cells were covered in urine
and feces; (2) he was denied a mattress; (3) when he received a mattress, it was covered in urine
and feces; and (4) he was denied the ability to shower. *Id.* at ¶¶ 118-19.

[31] Mr. Adams avers that Deputy Superintendent Contino and Captain Nottingham
blocked him from calling his lawyer or accessing legal resources while he was preparing for trial.
*Id.* at ¶¶ 202, 234. He asserts that other inmates on RHU, like inmate Michael Mogilivech, are
not blocked from calling their lawyer. *Id.* at ¶ 241. He also claims that he asked Superintendent
Metellus and Deputy Superintendents Reed and Contino to get out of the MHU unit because "it
was causing him severe physical and psychological problems" and to get yard time. *Id.* at ¶ 233.

## II.    MOTIONS AT ISSUE

### A.    Individual County Defendants' motion to dismiss under Rule 12(b)(6)

Most of the individual named defendants,[32] collectively termed the "Individual County Defendants," joined a motion to dismiss Mr. Adams's amended complaint under Fed. R. Civ. Pro. 12(b)(6).  DI 83.  They assert that Mr. Adams fails to properly plead any violations of his constitutional rights while at BCCF.  DI 83-1 at 13.  Respecting his inadequate medical care claim, Individual County Defendants concede that Mr. Adams sufficiently pled that he was suffering from a "serious medical need" but insist that the facts suggest they did not act with deliberate indifference toward his medical needs — pointing to his placement on medical watch, receipt of medical treatment numerous times, and use of his prescribed medication without interference.  *Id.* at 13-15.  To Mr. Adams's excessive force claim, they respond that the force used to subdue Mr. Adams on November 21, 2022, was not excessive given the escalating circumstances; they specifically highlight that Mr. Adams was "screamingly crying" while kicking and destroying his cell door, with a pole in his hand as he launched himself toward Corrections Officer Williams, so they needed to physically handle and restrain him.  *Id.* at 15-17. Moreover, Individual County Defendants argue that Mr. Adams's conditions of confinement were not cruel and unusual because they served a legitimate purpose.  *Id.* at 17-18.  Pointing to Mr. Adams's depression, bi-polar disorder, PTSD, oppositional defiance disorder, and gender

---

[32] They include: Superintendent Metellus, Deputy Superintendents Reed and Contino, then-Director David Galione, Captain Nottingham, Lieutenants Whitesell, Hugg, Clayton, Kovach, and Wylie, Sergeants Murphy, Kinkelin, Anthony Cruz, O'Donnell, Grous, Beck, Raggi, Hodges, and Jurgelewicz, and Corrections Officers McFadden, Schuster, Faggins, Miles, Romana, Geibert, Connor, Harrison, Clarke, New, Butler, Mattoi, Gray, Hernandez, Labadie, Roque, Kasprzyk, Keefe, South, Polichetti, Barnett, Bromiley, Glenn, Hordijenko, Smythe, Simpson, and Black, and Hearing Officer Dittman.  DI 83 at 1-2.

dysphoria, as well as his admitted medication-hoarding to attempt suicide a second time, Individual County Defendants maintain that his classification and assignment to the MHU served a legitimate aim. *Id.* They similarly cite the need to effectively manage BCCF, especially given Mr. Adams's propensity to hoard medication, to justify the strip searches by Lieutenant Wylie and Sergeant Murphy. *Id.* at 18. Individual County Defendants also insist that the MHU restrictions — which included an anti-ligature bed and restricted hot water, showering, and clothing — were rationally related to Mr. Adams's safety and BCCF's effective operation. *Id.*

Next, Individual County Defendants assert that Mr. Adams's Fourth Amendment claims must fail because he has no reasonable expectation of privacy within his jail cell. *Id.* at 19. Mr. Adams's Sixth Amendment claims also fail, they proffer, because he did not plead any facts indicating that his "legal mail" was from his criminal attorney, rather than from a court or elsewhere — noting that Mr. Adams himself said the mail was not from his attorney. *Id.* at 20. Moreover, they argue that neither his allegations that BCCF's law library was insufficient, nor that he was denied access to Lexis Nexis, constitute a denial of his right to counsel. *Id.* Nor, they maintain, does Mr. Adams have a Sixth Amendment right to access the law library with respect to a civil action, such as this matter. *Id.* at 20-21. Individual County Defendants further aver that disciplinary confinement does not constitute a deprivation of liberty under the Fourteenth Amendment and underscore that their actions would not inevitably affect the duration of Mr. Adams's sentence. *Id.* at 22. Because they conclude that Mr. Adams fails to properly state any constitutional violations, Individual County Defendants contend that they are entitled to qualified immunity. *Id.* at 22-23.

Individual County Defendants next argue that Mr. Adams failed to establish supervisory

liability under 42 U.S.C. § 1983 against Superintendent Metellus, Deputy Superintendents Reed and Contino, Captain Nottingham, and Lieutenants Kovach and Hugg because he did not allege that they were (1) policymakers; (2) aware of the alleged constitutional violations but failed to act to prevent them; or (3) the direct cause of his alleged harm. *Id.* at 23-25. Moving to the ADA and Rehabilitation Act, they insist that BCCF officials are not proper defendants because they neither control nor direct the functioning of the public entity, nor are they the recipients of federal financial assistance. *Id.* at 26-27. Moreover, they state that Mr. Adams fails to (1) allege that he is a qualified individual with a disability under either the ADA or Rehabilitation Act because he does not plead how he is so qualified beyond baldly asserting that his disability "substantially limits his major life activities"; (2) plead any facts suggesting that he was precluded from participating in any mental health services or programs; and (3) establish the causation requirement under the ADA and Rehabilitation Act because he does not demonstrate a nexus between any inadequate medical care and his disability. *Id.* at 27-28.

Because Individual County Defendants assert that there are no surviving federal questions, they argue that we cannot exercise jurisdiction over Mr. Adams's remaining state law claim (professional negligence). *Id.* at 29. Regardless, they insist that (1) corrections officers typically are not considered "licensed professionals" under Pennsylvania law, which is required for a professional negligence claim; (2) Mr. Adams fails to establish that the defendants owed him a duty, nor that they breached such a duty; and (3) the Pennsylvania Political Subdivision Tort Claims Act (PSTCA) bars the BCCF employees from liability because he did not establish that they acted outside the scope of their duties nor engaged in conduct that constituted a "crime, actual fraud, actual malice or willful misconduct." *Id.* at 29-31. Finally, Individual County

Defendants state that they "do not believe that [Mr. Adams] properly exhausted his administrative remedies with regard to the numerous other allegations in the complaint." *Id.* at 16 n.4. To the extent that Mr. Adams attempts to add new facts through his response to their motion, they urge us to disregard these. DI 101 at 1.

In response, and in addition to reiterating the allegations in his amended complaint, Mr. Adams asserts that the conditions were sufficiently obvious such that BCCF officials either knew about them or purposefully ignored them. DI 97 at 1. He emphasizes the numerous complaints, grievances, and request slips he submitted regarding the alleged violations, as well as his allegations that (1) Deputy Superintendent Reed responded to slips from Mr. Adams complaining about Correction Officer Williams's consistent threats, degradation, and verbal assaults; (2) Corrections Officer Simpson witnessed inmate Boiling threaten Mr. Adams before the alleged assault; (3) Lieutenant Whitesell removed Corrections Officer Williams, whose history of misconduct was well-known, from the restricted housing unit (RHU) for a few days, indicating his knowledge of the officer's conduct; (4) he specifically complained about his lack of a mattress or shower access to Superintendent Metellus, Deputy Superintendents Reed and Contino, then-Director Galione, Captain Nottingham, Lieutenants Wylie, Clayton, Kovach, Hugg, and Whitesell, and Sergeants Murphy, Raggi, Beck, Grous, Noelia Cruz, Anthony Cruz, O'Donnell, and Kinkelin; (5) the aforementioned supervisors all saw Lieutenant Wylie remove the urine-and-feces-covered mattress from Mr. Adams's cell; (6) Lieutenant Clayton provided him with a mattress covered in feces and urine; and (7) he was rushed to Doylestown Hospital on November 28, 2022, due to the unsanitary living conditions and beatings from BCCF officials. *Id.* at 1-2, 11, 14-15. Mr. Adams emphasizes his numerous complaints, grievances, and request

14

slips regarding these issues and insists that BCCF tried to stop him from filing more grievances by transferring him to George W. Hill. Correctional Facility.  *Id.* at 1, 6.

**B.    Defendants' Sergeant Noelia Cruz and Correction Officers Williams, Swan, and Mayers' motion to join the Individual County Defendants' motion to dismiss**

Defendants' Sergeant Noelia Cruz and Correction Officers Williams, Swan, and Mayers moved to join the Individual County Defendants' motion to dismiss, asserting that the arguments raised therein equally apply to them.  DI 86 at 1.  They contend that their joinder will serve judicial economy without prejudicing Mr. Adams because he will face the same arguments, regardless.  *Id.* at 1-2.  Mr. Adams responds by reiterating that he did not fail to state a claim for relief and that his claims against all defendants have merit.  DI 96 at 1-2.

**C.    Defendants PrimeCare and Dr. Gessner's motion to dismiss under Rule 12(b)(6)**

PrimeCare and Dr. Gessner also moved to dismiss under Fed. R. Civ. Pro. 12(b)(6).  DI 88.  They assert that Mr. Adams failed to plead any facts (1) of alleged personal involvement against Dr. Gessner; (2) regarding PrimeCare policies and procedures respecting the provision of medical care at BCCF; nor (3) regarding how either Dr. Gessner or PrimeCare violated his First, Fourth, Eighth, or Fourteenth Amendment rights.  *Id.* at 2; DI 88-1 at 7-10.  According to them, Mr. Adams's professional negligence claim should be dismissed because he failed to file a certificate of merit and failed to plead any facts demonstrating professional negligence by either Dr. Gessner or PrimeCare.  DI 88-1 at 10-12.  Finally, they insist that neither Dr. Gessner nor PrimeCare performed any of the alleged unconstitutional conduct relevant to Mr. Adams's constitutional claims.  *Id.* at 13. And insofar as Mr. Adams attempts to insert new facts in his

response to their motion, they ask us to disregard these.  DI 100 at 1-2.

Mr. Adams retorts that, when he had a medical emergency and was sick and unresponsive on the floor of his cell, Nurse Jamie called Dr. Gessner and told her that Lieutenant Wylie had instructed him not to report the emergency.  DI 98 at 6.  According to Mr. Adams, the phone records and CCTV footage will verify this call, and this conduct demonstrates that Nurse Jamie and Dr. Gessner were deliberately indifferent to his serious medical needs, causing him needless suffering.  *Id.*  Additionally, he claims that Dr. Gessner ordered him to be put in an empty cell, without any of his property, and with a suicide guard after he was stripped naked in front of other inmates — claiming that this was the middle of winter, the cell was freezing cold and unsanitary, and he had no mattress, blankets, or bedding.  *Id.* at 10.

## III.    LEGAL STANDARDS

### A.    Rule 12(b)(6) challenges

A party may move to dismiss by asserting the complaint failed to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  When reviewing a Rule 12(b)(6) motion, we shall only consider "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016) (citation modified).  We also must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant."  *Id.* (citation modified).  However, conclusory allegations do not receive the same presumption of truth.  *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 789-790 (3d Cir. 2016).  Nor will a

"formulaic recitation of the elements of a cause of action" survive the pleadings stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified). Additionally, we must liberally construe the complaint when filed by a *pro se* litigant. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (per curiam); *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009) (citation modified). However, the *pro se* litigant still must plead sufficient facts to support his claims. *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (citation modified).

**B.    Section 1983 and Section 1985 claims**

42 U.S.C. § 1983 provides a cause of action for persons, including prisoners, deprived of their federal constitutional rights by individuals acting under color of state law. 42 U.S.C. § 1983. Section 1983 does not provide standalone substantive rights but rather serves as a mechanism for remedying violations of federal law by those acting under state authority. *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996) (citation modified).

Section 1985 provides a civil cause of action against individuals who conspire "for the purpose of depriving . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). To state a claim for relief under this statutory provision, the plaintiff must claim an underlying constitutional injury. *Durham v. Dep't of Corr.*, 173 Fed. Appx. 154, 157 (3d Cir. 2006) (citation modified); *see also Wongus v. Corr. Emergency Response Team ("CERT")*, 389 F. Supp. 3d 294, 302 (E.D. Pa. 2019) (citation modified). Moreover, the plaintiff must allege that the conspirators (1) engaged in a conspiracy; (2) for the purpose of directly or indirectly depriving him of equal protection, or equal privileges and immunities; (3) acted in furtherance of the conspiracy; and (4) as a result of

those actions, caused him or his property injury or otherwise deprived him of any privilege or right of a U.S. citizen. *Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006) (citation modified). The plaintiff also must allege that the conspirators acted with racial, or otherwise class-based, "invidiously discriminatory animus." *Id.* at 135.

## C.     ADA and Rehabilitation Act claims

Title II of the Americans with Disabilities Act (ADA) provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C § 794(a). The substantive liability standards for these statutes are the same. *Gibbs v. City of Pittsburgh*, 989 F.3d 226, 229 (3d Cir. 2021) (citation modified). Under the ADA, plaintiffs may sue "employers and public entities" but not individual employees. *Talley v. Clark*, 2023 WL 118470, at *1 n.2 (3d Cir. Jan. 6, 2023) (per curiam) (*citing Emerson v. Thiel Coll.*, 296 F.3d 184, 189 (3d Cir. 2002) (per curiam)); *see also Kokinda v. Pa. Dep't of Corr.*, 779 Fed. Appx. 944, 949 (3d Cir. 2019). Plaintiffs may likewise sue recipients of federal financial assistance, but not individuals, under the Rehabilitation Act. *A.W.*

*v. Jersey City Pub. Sch.*, 486 F.3d 791, 804 (3d. Cir. 2007) (citation modified).

**D.      State claims and sovereign immunity**

**i.      Defamation**[33]

Section 11 of Article 1 of the Pennsylvania Constitution immunizes from suit Commonwealth officials and employees acting within the scope of their duties, unless the General Assembly has specifically waived such immunity.  1 Pa. C.S. § 2310.  Under Pennsylvania law, defamation is an intentional tort, and Commonwealth officials and employees acting within the scope of their duties are immune from suit for such torts.  *Brown v. Clark*, 184 A.3d 1028, 1029-30 (Pa. Cmwlth. 2018) (citation modified).  "Conduct is within the scope of employment when it is the type of activity the person is employed to perform, occurs in an authorized time and space, is at least partly in service of the employer's interest, and does not involve a degree of force beyond that expected by the employer."  *Id.* at 1030 (citation modified).  Moreover, even unauthorized acts may fall within the scope of employment when "they are clearly incidental to the master's business."  *Brumfield v. Sanders*, 232 F.3d 376, 381 (3d Cir. 2000) (citation modified).

**ii.      Harassment**

Pennsylvania does not recognize a cause of action in tort for harassment.  *Sobel v. Wingard*, 531 A.2d 520, 522-23 (Pa. Super. 1987).  Nor are allegations of verbal threats, abuse, or harassment cognizable under § 1983.  *Mimms v. U.N.I.C.O.R.*, 386 Fed. Appx. 32, 35 (3d Cir. 2010); *see also Murray v. Woodburn*, 809 F. Supp. 383, 384 (E.D. Pa. 1993).

---

[33] Though we discuss defamation in the context of a state tort claim, we also note that defamation is not actionable under the due process clause.  *Aleem-x v. Westcott*, 347 Fed. Appx. 731, 732 (3d Cir. 2009).

19

### iii.     Professional negligence and negligence

Pursuant to Rule 1042.1 of the Pennsylvania Rules of Civil Procedure, a client or patient may bring a professional negligence claim against a "licensed professional" or "a partnership, unincorporated association, corporation or similar entity . . . responsible for a licensed professional who deviated from an acceptable professional standard[.]"  Pa. R. Civ. Pro. 1042.1(a).  The rule defines "licensed professional" as any person licensed under Pennsylvania law, or the laws of another state, as a healthcare provider, accountant, architect, chiropractor, dentist, engineer, land surveyor, nurse, optometrist, pharmacist, physical therapist, psychologist, veterinarian, or lawyer.  Pa. R. Civ. Pro. 1042.1(c).  State corrections officers do not constitute "licensed professionals" under Pennsylvania law.  *Woods v. Morris*, 2022 WL 11962108, at *4 (W.D. Pa. Oct. 20, 2022).  Additionally, a plaintiff asserting professional negligence must file, either with the filing of the complaint or sixty days thereafter, a signed certificate of merit respecting the liability claim.  Pa. R. Civ. Pro. 1042.3.

Negligence, by contrast, requires the plaintiff to prove: (1) the defendant had a duty or obligation to conform to a particular standard; (2) the defendant failed to conform to that standard; (3) the defendant's conduct caused the resulting injury; and (4) as a result, the plaintiff suffered damage or actual loss.  *In re TMI Gen. Pub. Utils. Corp.*, 67 F.3d 1103, 1117 (3d Cir. 1995) (citation modified).  Again, Commonwealth officials and employees acting within the scope of their duties are immune from suit for intentional torts absent specific exceptions.  1 Pa. C.S. § 2310.  The General Assembly has waived sovereign immunity with respect to Commonwealth parties "for damages arising out of a negligent act where the damages would be recoverable under the common law or a statute creating a cause of action if the injury were

20

caused by a person not having available the defense of sovereign immunity" for, *inter alia*, "[t]he care, custody or control of personal property in the possession or control of Commonwealth parties, including Commonwealth-owned personal property and property of persons held by a Commonwealth agency."  42 Pa.C.S. § 8522(a), (b)(3); *see also Miller v. Nowakowski*, 2025 WL 1938692, at *6 (W.D. Pa. July 14, 2025) (discussing negligence claims surviving sovereign immunity subject to this statutory exception).

IV.    **DISCUSSION**

A.    **Defendants' Sergeant Noelia Cruz, Corrections Officer Frank Williams, Corrections Officer Dylan Swan, and Corrections Officer Aaron Mayers are permitted to join the Individual County Defendants' motion to dismiss**

Mr. Adams does not provide any substantive argument in opposition to the request by Defendants Sergeant Noelia Cruz and Corrections Officers Williams, Swan, and Mayers (DI 86) to join the Individual County Defendants' motion to dismiss (DI 83).  Moreover, we agree that the Individual County Defendants' arguments in their motion to dismiss equally apply to these four defendants — indeed, Mr. Adams asserts similar claims against both groups of defendants, based on alleged conduct involving various configurations of these individuals.  We also believe that permitting their joinder will serve judicial economy without prejudicing Mr. Adams, as Mr. Adams will face the same arguments from just one group of defendants, rather than two. Accordingly, we grant this motion to join the Individual County Defendants' motion to dismiss. *See Rossano v. Maxon*, 659 F. Supp. 3d 559, 565 (E.D. Pa. 2023) (stating that a motion to join is typically granted when it is unopposed, the arguments proffered by the moving defendant apply equally to all co-defendants, and joinder will not prejudice the plaintiff) (citation modified).

B.    **Defendants Nurse Jamie, Nurse Enna, and Chief Medical Administrator Brian**

21

**Norfleet are dismissed for lack of service**

More than ninety days have passed since Mr. Adams filed his amended complaint.  DI 40.  Despite two attempts, defendants Nurse Jamie, Nurse Enna, and Chief Medical Administrator Brian Norfleet have not been properly served.  *See* Fed. R. Civ. Pro. 4(m); DI 47, 64, 80, 81.  Insufficient information from Mr. Adams appears to have caused this lack of service.  DI 81 at 3-5.  Though we are sympathetic to the challenges of effectuating service while incarcerated, we have given Mr. Adams two opportunities to do so over the 28-month-period since he initially filed this case.  Because Nurse Jamie, Nurse Enna, and Mr. Norfleet have not been properly served, we dismiss all claims against them without prejudice.

**C.    Defendants David Galion, PrimeCare, Dr. Victoria Gessner, Sergeant Jurgelewicz, and Corrections Officers Mayers, Hordijenko, Glenn, Barnett, Polichetti, Kasprzyk, Roque, Mattoi, Romana, Miles, Faggins, Hodges, Kovach, McFadden, Bromiley, Clarke, Black, Swan, and Williams are dismissed for failure to state a claim under Rule 12(b)(6)**

Because Mr. Adams does not plead sufficient facts to state a claim for relief under Rule 12(b)(6), the above-named defendants are dismissed.  Mr. Adams pleads no facts in his operative complaint with respect to David Galion, PrimeCare, or Dr. Gessner, thus requiring their dismissal.  Regarding Sergeant Jurgelewicz and Corrections Officers Mayers, Hordijenko, Glenn, Barnett, Polichetti, Kasprzyk, Roque, Mattoi, Romana, Miles, Faggins, Hodges, and Kovach, Mr. Adams solely alleges conduct related to a Fourth Amendment unreasonable search and seizure claim — here, their searches of his cell.  These defendants are dismissed because convicted prisoners do not have a legitimate expectation of privacy in their cell — in other words, the Fourth Amendment proscription against unreasonable searches and seizures does not apply within the prison cell's confines. *Hudson v. Palmer*, 468 U.S. 517, 526 (1984); *United*

*States v. Stanishia*, 687 Fed. Appx. 183, 185 (3d Cir. 2017).  Against Corrections Officers Bromiley and Clarke, Mr. Adams only alleges conduct related to Fourth Amendment searches and seizures (again, which is not cognizable) and harassment (which is likewise not cognizable), so we dismiss these defendants.  *See Sobel*, 531 A.2d at 522-23 (stating Pennsylvania does not recognize a cause of action in tort for harassment); *Mimms*, 386 Fed. Appx. at 35 (explaining allegations of harassment, verbal threats, or abuse are not cognizable under § 1983); *Murray*, 809 F. Supp. at 384 (same).  Mr. Adams also fails to state a claim against Corrections Officer Williams, as his allegations against him involve harassment and threats, equal protection violations, defamation, and unreasonable searches and tampering with his property — none of which are cognizable.[34]  Moreover, Mr. Adams solely raises allegations against Corrections Officers Black and Swan regarding harassment (again, which are not cognizable) and the conditions he faced (which he does not sufficiently plead),[35] so we also dismiss these defendants. Finally, Mr. Adams's claim of excessive force against Corrections Officer McFadden — the only claim to which his allegations against this officer pertain other than the non-cognizable Fourth

---

[34] We have explained above that claims regarding harassment, threats, and searches and seizures of property are not cognizable.  Below, we will explain why Mr. Adams's equal protection and defamation claims also must be dismissed.  *See infra* at 23-24.

[35] To state a conditions claim, Mr. Adams must allege that these officers committed conduct that rose to the level of denying him "the minimal civilized measure of life's necessities" and exposing him to an obvious, substantial risk of harm.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  We do not find that one alleged instance of denying Mr. Adams a shower or warm water with which to wash himself — the sole allegation in the complaint against these defendants — rises to this level.  DI 40 at ¶¶ 118, 147.

Amendment search claim — also is dismissed for failure to state a claim.[36]

**D.    Mr. Adams's ADA, Rehabilitation Act, defamation, professional negligence, equal protection, and conspiracy claims are dismissed in their entirety**

We dismiss these claims against all defendants.  First, Mr. Adams's ADA and Rehabilitation Act claims are dismissed because neither statute provides for liability against individual employees.  *Talley*, 2023 WL 118470 at *1 n.2 (citation modified) (explaining "that there is no liability under [the ADA] for individual employees"); *Kokinda*, 779 Fed. Appx. at 949 (same); *A.W.*, 486 F.3d at 804 (citation modified) (stating the Rehabilitation Act only allows plaintiffs to sue recipients of federal financial assistance, not individuals).  All remaining defendants in this case are individual employees, not employers, public entities, or recipients of federal financial assistance.

Next is defamation.  Federally, defamation is not actionable as a deprivation of liberty under the due process clause.  *Aleem-x*, 347 Fed. Appx. at 732 (citation modified).  Moreover, Commonwealth employees (such as the defendants here)[37] are immunized from suit for

---

[36] Mr. Adams alleges one instance in which Corrections Officer McFadden placed handcuffs on him extremely tightly.  DI 40 at ¶ 228.  Because Mr. Adams does not plead any other facts to suggest that the tightness of the handcuffing, other than his personal discomfort, was malicious, sadistic, or willfully causing him harm, nor any facts that indicate how long he was handcuffed in this manner, we do not believe this is sufficient to plead excessive force against Corrections Officer McFadden.  *See Love v. New Jersey Dep't of Corr.*, 2016 WL 2757738, at *5 (D.N.J. May 12, 2016) ("As Plaintiff has pled no facts other than his discomfort to suggest any improper motivation (such as malicious or sadistic purposes), Plaintiff's second claim also falls short of pleading a proper Eighth Amendment claim for excessive force and must also be dismissed without prejudice."); *Lizama v. Hendricks*, 2014 WL 673103, at *6 (D.N.J. Feb. 20, 2014) (concluding the use of overly tight handcuffs did not establish an Eighth Amendment excessive force claim absent facts showing more than minimal force, an improper motive, or an extended period of handcuffing).

[37] Mr. Adams claims that Sergeant Noelia Cruz and Corrections Officers Williams,

defamation so long as the alleged defamatory conduct occurred within the scope of their employment.  1 Pa. C.S. § 2310; *Brown*, 184 A.3d at 1029-30.  Mr. Adams has not pled any facts to suggest that these individuals were acting outside the scope of their employment when they called him a rat and a snitch; rather, the pleadings indicate that each officer was on duty, performing their responsibilities of searching Mr. Adams's cell and monitoring the block, when they allegedly defamed him.  Accordingly, we dismiss the defamation claims in their entirety because they are barred by the doctrine of sovereign immunity and otherwise non-cognizable.

Mr. Adams's professional negligence claims also must be dismissed because none of the individuals against whom he asserts this claim[38] are "licensed professionals" for purposes of professional negligence.  Pa. R. Civ. Pro. 1042.1(c); *see also Woods*, 2022 WL 11962108 at *4 (explaining that state corrections officers are not "licensed professionals" under Pennsylvania law).  To the extent that we construe Mr. Adams as alleging negligence, such claims also fail because he, again, has not shown that these individuals acted outside the scope of their duties when they committed such negligence or that their conduct is otherwise not shielded by sovereign immunity.  1 Pa. C.S. § 2310; 42 Pa.C.S. § 8522.

We also dismiss Mr. Adams's equal protection and related conspiracy claims.  "To state an equal protection claim, [Mr. Adams] must allege that he was treated differently than other similarly situated inmates, and that this different treatment was the result of intentional

---

Simpson, and Clarke defamed him.

[38] He asserts this claim against Superintendent Metellus, Deputy Superintendents Reed and Contino, Captain Nottingham, Lieutenants Whitesell, Hugg, Clayton, Kovach, and Wylie, Sergeants Murphy, Kinkelin, Anthony Cruz, Noelia Cruz, O'Donnell, Grous, Beck, Raggi, and Jurgelewicz, and Corrections Officers Simpson and Williams.  DI 40 at 52-55.

discrimination based on his membership in a protected class[.]" *Mack v. Loretto*, 839 F.3d 286, 305 (3d Cir. 2016) (citation modified).  Though Mr. Adams alleges various circumstances in which he was differentially treated — such as the searches of his cell, his inability to obtain clean clothes, his access to legal resources, his ability to press charges against other inmates, and sexual harassment by Corrections Officer Williams — he does not allege sufficient facts to suggest that this differential treatment was the result of intentional discrimination based on his membership in a protected class.  He protests that his cell was searched daily at 3:00 a.m., while two white inmates who also received suboxone and were on RHU status in the MHU were not searched, yet his allegations indicate that this differential treatment was due to his alleged assault of Officer Williams and his filing of grievances against BCCF staff — not his race or another protected characteristic.  DI 40 at ¶¶ 193, 200, 214-15.  Nor does he tie the clothing or legal access differences to any protected characteristic.  *Id.* at ¶¶ 221, 229, 234, 241, 258. Additionally, Mr. Adams's bare statement that he is black and was denied the ability to file charges against a white inmate, while the white inmate was allowed to press charges against him, is not enough to plead intentional racial discrimination.  *Id.* at ¶ 216.  And regarding the alleged sexual harassment by Corrections Officer Williams, Mr. Adams does not provide any information about how this officer treated similarly situated members of an unprotected class. Accordingly, his equal protection claims are dismissed.  Moreover, because Mr. Adams's equal protection claims are dismissed due to his failure to identify class-based discrimination, and a conspiracy claim under Section 1985 requires the plaintiff to plead such class-based discrimination, we also dismiss his conspiracy claims.  *See Farber*, 440 F.3d at 134-35.

**E.      Mr. Adams's Eighth Amendment claims survive against most defendants**

Mr. Adams raises four distinct Eighth Amendment claims: (1) inadequate medical care;

(2) unsuitable conditions of confinement; (3) excessive force; and (4) unnecessary and

humiliating strip searches.  Under the Eighth Amendment, made applicable to the states through

the Fourteenth Amendment, the denial of adequate medical care to a prisoner may constitute

cruel and unusual punishment.  *See Estelle v. Gamble*, 429 U.S. 97, 101-05 (1976).  Such a

deprivation occurs when prison staff act with deliberate indifference toward the prisoner's

serious medical needs.  *Id.* at 104 (citation modified); *Rouse v. Plantier*, 182 F.3d 192, 197 (3d

Cir. 1999). "Deliberate indifference . . . requires obduracy and wantonness . . . likened to conduct

that includes recklessness or a conscious disregard of a serious risk." *Rouse*, 182 F.3d at 197

(citation modified).  "[I]t is enough that the official acted or failed to act despite his knowledge

of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842 (citation modified).  "We may

infer the existence of this subjective state of mind from the fact that the risk of harm is

obvious[,]" *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (citation modified), as well as from

circumstantial evidence.  *Farmer*, 511 U.S. at 842.  Such indifference may stem from prison

doctors' responses to the prisoner's needs or the actions of prison guards to intentionally deny,

delay, or interfere with the prisoner's access to medical care.  *See Estelle*, 429 at 104-05 (citation

modified).  Here, defendants concede that Mr. Adams has sufficiently plead the serious medical

needs element.  DI 83-1 at 14.  The question is whether these defendants acted with deliberate

indifference toward these medical needs.  In large part, we conclude that they did.

Mr. Adams alleges that he notified Superintendent Metellus, Deputy Superintendents

Reed and Contino, Captain Nottingham, and Lieutenant Clayton of the deliberate indifference he

was facing toward his serious medical needs which, based upon the allegations in his complaint, involved his assertions that (1) Nurse Enna was poisoning him; (2) he was facing discrimination as a result of his suboxone use (including BCCF staff attempting to interfere with his use of such suboxone by telling him to stop using it); and (3) his placements in unsanitary cells were causing him severe psychological and physical problems. DI 40 at ¶¶ 91-93, 97, 118, 137, 139, 201, 233. A central thrust of Mr. Adams's complaint is that these individuals failed to take action in response to his reports. This is sufficient to state a claim of inadequate medical care against these defendants, as Mr. Adams's allegations demonstrate their failure to act despite their knowledge of a substantial risk of harm to Mr. Adams. *See Santiago v. Warminster Twp.*, 629 F.3d 121, 129 (3d Cir. 2010) ("[A] supervisor may be personally liable . . . if he or she . . . had knowledge of and acquiesced in his subordinates' violations.") (citation modified). With respect to Sergeant Anthony Cruz, Mr. Adams alleges that he told Sergeant Cruz that inmate Boiling attacked him and specifically asked to be checked out by medical staff and to receive a rape kit examination. DI 40 at ¶ 77. Mr. Adams alleges that Sergeant Cruz denied him medical treatment and instead locked him in his holding cell. *Id.* This is sufficient to state a claim against Sergeant Anthony Cruz for inadequate medical treatment. The inadequate medical care claims against Sergeants Noelia Cruz and O'Donnell, and Corrections Officer Smythe also survive dismissal given their alleged statements to Mr. Adams that he should stop taking suboxone to avoid the constant searches of his cell — which we construe as attempted interference with the taking of his medication. DI 40 at ¶ 204. However, because Mr. Adams alleges no facts regarding inadequate medical care with respect to Lieutenant Wylie or Sergeant Murphy, we dismiss this claim against them. We dismiss any other inadequate medical care

claims against any other defendants.

Next are Mr. Adams's Eighth Amendment claims related to his conditions of confinement: namely, his lack of access to food, clothing, bedding, and hygienic conditions. The Eighth Amendment requires prison officials to "provide humane conditions of confinement" which requires them to "ensure that inmates receive adequate food, clothing, shelter, and medical care" and to "take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832-33 (citation modified). Additionally, "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Id.* at 833 (citation modified); *see also Hudson*, 468 U.S. at 526-27 (stating prison staff and administrative personnel "are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves"). Though "prison conditions may be restrictive and even harsh . . . gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective" and "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer*, 511 U.S. at 834 (citation modified). However, a prison official violates the Eighth Amendment only if (1) the deprivation is sufficiently serious, such that the prison official's act or omission causes the prisoner to be denied "the minimal civilized measure of life's necessities" and put in "conditions posing a substantial risk of serious harm"; and (2) the prison official acted with deliberate indifference to the inmate's safety or health. *Id.* at 834 (citation modified). The same deliberate indifference standard applies to conditions of confinement and inadequate medical care claims. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (citation modified).

Exposure to unsanitary conditions such as a cell and mattress covered in urine and feces

denies a prison "the minimal civilized measure of life's necessities" and exposes the prisoner to an obvious, substantial risk of serious harm. *Farmer*, 511 U.S. at 834; *Rosario v. Wetzel*, 2025 WL 2452464, at *2 (3d Cir. Aug. 26, 2025) (citation modified). So, too, does denying a prisoner a mattress, bedding, or clothing in a freezing cold cell, as well as denying a prisoner food (or non-tampered-with food). Thus, based upon their specific, alleged knowledge of (and participation in) Mr. Adams's claimed exposure to unsanitary and inhospitable conditions — including urine-and-feces covered mattresses and cells and a lack of a mattress, bedding, clothing, and food — Mr. Adams has adequately pled conditions claims against Superintendent Metellus, Deputy Superintendents Contino and Reed, Captain James Nottingham, Lieutenants Wylie, Clayton, Whitesell, and Hugg, Sergeants Murphy, Anthony Cruz, Kinkelin, Beck, Noelia Cruz, O'Donnell, Grous, and Raggi, and Corrections Officers Connor, New, and Gray. Mr. Adams has also sufficiently pled a conditions claim against Corrections Officer Simpson based on his allegations that the officer knowingly enabled inmate Boiling to assault him. *Id.* at ¶¶ 68-82. We dismiss any other conditions claim asserted against any other defendant.

Mr. Adams's next Eighth Amendment claim concerns excessive force.[39] To prevail, he must show that the prison officials used force "maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7 (citation modified). We may consider the extent of the prisoner's injury to determine whether that injury "evinced such wantonness with respect to the unjustified

---

[39] Though Mr. Adams couches his excessive force claim in the Fourth Amendment, we liberally construe his *pro se* complaint as alleging excessive force under the Eighth Amendment and evaluate all named defendants against this claim, given that he alleges a general Eighth Amendment claim against all defendants. DI 40 at 61; *see also Graham v. Connor*, 490 U.S. 386, 394 (1989) (observing excessive force claims tend to arise under the Fourth Amendment in the arrest context but under the Eighth Amendment in the convicted prisoner context).

infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation modified). However, Mr. Adams need not show that he suffered significant injury due to the use of force. *Id.* at 9 (citation modified). Moreover, the Eighth Amendment does not prohibit "*de minimis* uses of physical force*" when the use of such force "is not of the sort repugnant to the conscience of mankind." *Id.* at 9-10.

Mr. Adams alleges that Lieutenant Wylie and Sergeant Murphy violently slammed him on a stretcher while he was handcuffed behind his back. DI 40 at ¶ 121. Construed in the light most favorable to Mr. Adams, we conclude that the violent slamming of an individual undergoing a medical emergency onto a stretcher constitutes the malicious and sadistic use of force, performed with "a knowing willingness that [harm] occur." *Hudson*, 503 U.S. at 6-7. The excessive force claims against Lieutenant Wylie and Sergeant Murphy thus survive dismissal. Mr. Adams also alleges that Sergeant Beck, along with Corrections Officers Geibert and John Doe #2, aggressively slammed him on the hard bed and put leg irons on him, punched him in the head, and (along with Corrections Officer Geibert) grabbed his arms through the tray slot in a manner that caused him to hyperextend his arms and shoulders. This is sufficient to plead excessive force against Sergeant Beck and Corrections Officers Geibert and John Doe #2, so the excessive force claims against them remain. DI 40 at ¶¶ 111, 113-14. Additionally, Mr. Adams's allegation that Corrections Officer Schuster kneed him in the head while he was lying in a defenseless position, causing his skin to tear from his temple, also suffices to survive dismissal of his excessive force claim against Corrections Officer Schuster. *Id.* at ¶ 106. Against Corrections Officer Hernandez, Mr. Adams alleges that the officer put leg irons on his swollen ankles and legs, told Mr. Adams to lift his legs and, after Mr. Adams told the officer that

he could not lift his legs, forcefully bent his legs and "pull[ed] the leg iron upwards with great strength, causing the leg iron that was attached to [Mr. Adams's] other leg to cut into his skin." *Id.* at ¶ 243. Mr. Adams states that his hands were cuffed behind his back while he faced the wall, yelling "out of tremendous pain" for Sergeant Noelia Cruz's help, while Corrections Officer Hernandez continued to pull the leg irons. *Id.* Mr. Adams asserts that the officer only stopped when Sergeant Cruz took the leg iron out of his hands. *Id.* This is sufficient to plead excessive force against Corrections Officer Hernandez. His claim that John Doe #1 punched him twice in the head, while Mr. Adams was in a defenseless position, is likewise sufficient to state an excessive force claim against John Doe #1. *Id.* at ¶ 106.

However, Mr. Adams's excessive force claims against Corrections Officer South must be dismissed. Mr. Adams alleges that Officer South ran at him full-speed and attempted to head-butt him — but missed — while Mr. Adams was lying on the ground, in a defenseless position. *Id.* at ¶¶ 105, 249-253. Though a plaintiff pleading an excessive force claim need not show that he suffered serious injury, he must show there was "force was applied" or "use[d]" against him. *Hudson*, 503 U.S. at 7, 9. The use of force involves "[t]he employment of physical power against another." USE OF FORCE, Black's Law Dictionary (12th ed. 2024). We have been unable to unearth any cases in which a court has found cognizable an excessive force claim under the Eighth Amendment in the absence of some sort of physical contact between the defendant (through their body or an object deployed by them) and the plaintiff. Additionally, without any claim that Officer South actually struck Mr. Adams, we are hard pressed to conclude that Mr. Adams's injury was anything more than *de minimus*. Accordingly, the excessive force

claim against Officer South is dismissed.[40]  We dismiss all other excessive force claims against all other defendants.

Finally, Mr. Adams claims that he was subjected to unnecessary and humiliating strip searches.  DI 40 at ¶¶ 128, 135, 159-60.  Strip searches "do not constitute cruel and unusual punishment unless they are undertaken maliciously or for the purposes of sexually abusing an inmate."  *Parkell v. Danberg*, 833 F.3d 313, 336 (3d Cir. 2016) (citation modified).  Here, Mr. Adams asserts that Lieutenant Wylie and Sergeant Murphy twice stripped him naked and left him exposed to other inmates "for some period of time" to humiliate and degrade him.  DI 40 at ¶¶ 128, 135.  Because we can reasonably infer malicious intent from leaving a prisoner naked for a period of time, in front of other inmates, after the search was completed, we conclude that Mr. Adams has sufficiently pled Eighth Amendment claims against Lieutenant Wylie and Sergeant Murphy regarding these strip searches.  *See Parkell*, 833 at 336 (discussing cases where a prisoner states an Eighth Amendment claim when the strip search was motivated by a desire to humiliate or harass).  Mr. Adams's only other allegation respecting strip searches is against Sergeant Noelia Cruz, whom he claims made fun of his body parts while observing such searches and stated, "I'll watch you be stripped searched as much as a I want."  DI 40 at ¶¶ 159-60.

---

[40] To the extent that Mr. Adams's allegations could be construed as raising an assault claim against Officer South, we also find his pleadings deficient.  To successfully plead an assault claim against Officer South, Mr. Adams would have to plead sufficient facts to establish that Officer South was acting outside the scope of his role — otherwise, sovereign immunity would bar this claim.  *Gorrio v. Keil*, 2025 WL 2636593, at *5-6 (E.D. Pa. Sept. 12, 2025).  Our courts tend to examine whether the officer's alleged attack on the prisoner "was entirely unprovoked" such that it fell outside the scope of his duties.  *Id.* at *7.  Here, Mr. Adams admits that Officer South was responding to Mr. Adams, who had run out of his cell, with a metal pole, and was barreling toward Officer Williams.  DI 40 at ¶¶ 102-05.  Even construed in the light most favorable to Mr. Adams, he has not plead sufficient facts to make out an assault claim.

Sergeant Noelia Cruz was not the individual conducting the searches, and Mr. Adams does not plead any facts indicating that she ordered the searches or otherwise prolonged them for the purpose of harming, humiliating, or harassing him.  Thus, we dismiss this claim against Sergeant Noelia Cruz.  Because Mr. Adams does not allege anything further regarding the strip searches with respect to any other defendants, we dismiss this claim against all other defendants.

**F.    Mr. Adams's Fourth Amendment claims respecting the strip searches survive against Lieutenant Wylie and Sergeants Murphy and Noelia Cruz**

We also construe Mr. Adams as raising a Fourth Amendment violation arising from the strip searches.  Unlike Fourth Amendment claims for searches and seizures of the prison cell, which are not cognizable, Fourth Amendment claims regarding an inmate's right of bodily privacy are cognizable.  *Parkell*, 833 F.3d at 325.  Such a right is "subject to reasonable intrusions necessitated by the prison setting."  *Id.*  In assessing reasonableness, we consider the scope of and justification for the intrusion, how it is conducted, and where it is conducted.  *Id.* at 326 (citation modified).  Though Individual County Defendants attempt to justify the strip searches by Lieutenant Wylie and Sergeant Murphy based on Mr. Adams's propensity to hoard his medication, they provide no explanation for why it was necessary to conduct these searches in front of other inmates or to leave Mr. Adams exposed for some time after the searches concluded.  Nor do Individual County Defendants explain why it was necessary to conduct these searches in front of Sergeant Noelia Cruz, a female officer who was not involved in the search, and who joked about Mr. Adams's body parts while observing the search.  Based on the manner and location of the strip searches, we find that Mr. Adams has sufficiently alleged a violation of his right to bodily privacy under the Fourth Amendment against these three defendants.  *See McMillan v. Hughes*, 2018 WL 3945467, at *6 (D.N.J. Aug. 16, 2018) ("Plaintiff's allegations

that corrections officers . . . made degrading comments about his body and threatened him during

a strip search performed in front of other inmates and staff not involved in the search, is

sufficient to state a claim that the search was unreasonable in violation of the Fourth

Amendment."), *but see Taylor v. Pennsylvania*, 2018 WL 6574187, *15 (E.D. Pa. Dec. 12, 2018)

("The mere fact that [the plaintiff] was strip searched in front of other inmates is not

unreasonable considering the legitimate government concerns relating to maintaining safety,

protecting officers, and keeping contraband out of prisons. His allegations in no way show that

prison officials moved beyond the scope of what was reasonable.").  We dismiss all other Fourth

Amendment claims against all other defendants.

**G.    Mr. Adams's claims regarding his access to the courts and interference with his legal mail survive with respect to some, but not all, defendants**

Mr. Adams asserts interference with his freedom of speech, association, access to

counsel, and access to legal resources.  We construe Mr. Adams as raising two distinct claims:

that BCCF staff (1) violated his right of access to the courts under the First and Fourteenth

Amendments; and (2) interfered with his legal mail in violation of the First Amendment.  To

prevail on an access to the courts claim, Mr. Adams must demonstrate that he suffered an actual

injury from the interference by BCCF staff.  *Lewis v. Casey*, 518 U.S. 343, 349 (1996) (citation

modified); *Oliver v. Fauver*, 118 F.3d 175, 177-78 (3d Cir. 1997); *Jones v. Brown*, 461 F.3d 353,

359 (3d Cir. 2006) (citation modified) (stating "the inmate must show that his or her exercise of

the right at issue, the right of accessing the courts to secure judicial relief, has been infringed in

some consequential way.").  "Allegations that the state has not provided adequate preconditions

to effectuate the right of access to the court, such as law libraries or legal services, are

insufficient."  *Jones*, 461 F.3d at 359.  "[T]he underlying cause of action, whether anticipated or

lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation[,]" and the underlying claim must be "arguable" and "nonfrivolous." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002).

Here, Mr. Adams claims that Sergeant Noelia Cruz and a non-defendant officer searched through his legal mail on May 29, 2023, while he was being held outside of the cell with other officers. DI 40 at ¶ 231. He claims that this search caused him to lose evidence showing Deputy Superintendent Reed's responses to his grievances and his medical request slips to PrimeCare regarding Nurse Enna's alleged misadministration of his medication. *Id.* We construe the loss of documents allegedly supporting Mr. Adams's claims before this court to constitute actual injury, such that Mr. Adams has sufficiently pled an access to the courts claim against Sergeant Noelia Cruz. Additionally, Mr. Adams's allegation that Lieutenant Hugg and Corrections Officer Keefe opened his legal mail outside of his presence, searched it, and removed legal material relevant to his parole hearing also is sufficient to allege actual harm, such that we conclude that he has sufficiently pled an access to the courts claim against them. *Id.* at ¶¶ 140, 142, 237. However, because Mr. Adams's allegation that Deputy Superintendent Contino and Captain Nottingham blocked him from using the law library and specifically Lexis Nexis on his tablet includes neither a claim of actual injury deriving from this lack of access, nor any specificity regarding what he was unable to work on as a result of his lack of access, we dismiss his access to the courts claims against these defendants. *Id.* at ¶ 234. To the extent that Mr. Adams raises access to the courts claims against any other defendants, we dismiss them.

As for Mr. Adams's First Amendment claim based on the alleged interference with his legal mail, Mr. Adams must show that there was a pattern or practice of such interference.

*Jones*, 461 F.3d at 359.  He need not show any injury beyond the violation of his ability to

engage in protected communications because such a freedom "is a constitutional end in itself."

*Id.* at 359-60.  However, Mr. Adams will not prevail on his claim if "the legal mail policy is

reasonably related to legitimate penological interests." *Id.* at 360 (citation modified).  In *Jones*,

the Third Circuit held that a prison's policy of opening legal mail outside of the inmates'

presence infringed upon their right to freedom of speech. *Id.* at 359.  Defendants have not

proffered a legitimate penological purpose for the alleged actions that they have taken regarding

Mr. Adams's legal mail or his communications with his lawyer.  DI 83-1.  We therefore find

sufficient, for purposes of a First Amendment interference claim, Mr. Adams's allegation that

Deputy Superintendent Contino and Captain Nottingham blocked him from being able to call his

lawyer.  DI 40 at ¶ 202.  Moreover, we conclude that Mr. Adams's allegations also demonstrate a

pattern or practice of reading and interfering with legal mail outside of Mr. Adams's presence.

Mr. Adams recounts specific conduct to that effect by Lieutenant Hugg, Sergeants Noelia Cruz

and Kinkelin, and Corrections Officers Harrison, Keefe, Bromiley, and Labadie, so his

interference claims against these defendants survive. *Id.* at ¶¶ 140, 142, 231, 237-38.  To the

extent that Mr. Adams raises First Amendment claims respecting his freedom of speech against

any other defendants, we dismiss those claims.

**H.    Mr. Adams' due process claims survive only with respect to Hearing Officer
        Dittman, Lieutenant Clayton, and Corrections Officers Butler and South**

Though Mr. Adams raises procedural due process claims against all defendants, such

claims survive dismissal only with respect to Hearing Officer Dittman, Lieutenant Clayton, and

Corrections Officers Butler and South.  The Constitution does not afford prisoners a liberty

interest in not being transferred to more adverse confinement conditions. *Wilkinson v. Austin*,

545 U.S. 209, 221-22 (2005). Rather, a prisoner holds a liberty interest that triggers due process protection under two circumstances: (1) "state statutes and regulations create a liberty interest in freedom from restraint that imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life"; or (2) "severe changes in conditions of confinement amount to a grievous loss that should not be imposed without the opportunity for notice and an adequate hearing." *Evans v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 650, 663 (3d Cir. 2011). Examples of severe changes in confinement conditions include the forced administration of antipsychotic medication, involuntary transfer to a mental hospital, or mandated participation in a sex-offender program for a prisoner with no sex offense conviction. *Evans*, 645 F.3d at 665.

Mr. Adams was not forced to take antipsychotic medication, go to a mental hospital, or participate in a sex-offender program. However, as is detailed above, he was moved to a unit (the MHU) which, based on his allegations, was grievously unsanitary and deprived him of a mattress, bedding, clean clothing, food, and warm water. Under these facts, Mr. Adams has established a liberty interest. Moreover, the complaint suggests that Mr. Adams's transfer to the MHU was related to the alleged incident on November 21st with Corrections Officers Williams and South, and that Mr. Adams was not afforded sufficient process regarding this incident. Mr. Adams alleges that Corrections Officer Butler falsely told Hearing Officer Dittman that Mr. Adams had waived his right to participate in a preliminary hearing respecting the incident, such that Hearing Officer Dittman — without ever asking Mr. Adams whether he wanted to participate in the hearing — sentenced Mr. Adams to an additional 20 days of RHU time in the MHU. DI 40 at ¶¶ 190, 218. Mr. Adams also claims that Corrections Officer South participated in the preliminary hearing, during which he falsely claimed that Mr. Adams had waived his right

to participate in the hearing. *Id.* at ¶ 252. Additionally, he alleges that Lieutenant Clayton re-wrote and altered his appeal of the November 21st misconduct determination. *Id.* at ¶ 85. Because Mr. Adams has sufficiently pled both a liberty interest and insufficient process for protecting that interest, we conclude that his due process claims survive against Hearing Officer Dittman, Lieutenant Clayton, and Corrections Officers Butler and South. We dismiss all due process claims against all other defendants for failure to plead the requisite due process elements.

## V.    CONCLUSION

Movants' respective motions to dismiss are granted in part and denied in part. The following defendants are dismissed from this case for failure to state a claim under Rule 12(b)(6): Nurse Jamie, Nurse Enna, Chief Medical Administrator Brian Norfleet, David Galion, PrimeCare, Dr. Victoria Gessner, Sergeant Jurgelewicz, and Corrections Officers Mayers, Hordijenko, Glenn, Barnett, Polichetti, Kasprzyk, Roque, Mattoi, Romana, Miles, Faggins, Hodges, Kovach, McFadden, Bromiley, Clarke, Black, Swan, and Williams. Mr. Adam's ADA, Rehabilitation Act, defamation, professional negligence, equal protection, and conspiracy claims are dismissed in their entirety.

The following Eighth Amendment claims survive dismissal only as follows: (1) inadequate medical care with respect to defendants Superintendent Metellus, Deputy Superintendents Reed and Contino, Captain Nottingham, Lieutenant Clayton, Sergeants Anthony Cruz, Noelia Cruz, and O'Donnell, and Corrections Officer Smythe; (2) unconstitutional conditions of confinement with respect to defendants Superintendent Metellus, Deputy Superintendents Contino and Reed, Captain Nottingham, Lieutenants Wylie, Clayton, Whitesell, and Hugg, Sergeants Murphy, Anthony Cruz, Kinkelin, Beck, Noelia Cruz, O'Donnell, Grous,

39

and Raggi, and Corrections Officers Connor, New, Gray, and Simpson; (3) excessive force with respect to defendants Lieutenant Wylie, Sergeants Murphy and Beck, and Corrections Officers Geibert, Schuster, Hernandez, John Doe #1, and John Doe #2; and (4) malicious strip searches with respect to Lieutenant Wylie and Sergeant Murphy.  All other Eighth Amendment claims against all other defendants are dismissed.

Mr. Adams's Fourth Amendment bodily privacy claims against Lieutenant Wylie and Sergeants Murphy and Noelia Cruz regarding the strip searches survive dismissal.  All other Fourth Amendment claims against all other defendants are dismissed.

Mr. Adams's claims regarding his access to the courts under the First and Fourteenth Amendments survive only against Sergeant Noelia Cruz, Lieutenant Hugg, and Corrections Officer Keefe.  All other claims regarding access to the courts are dismissed.  Additionally, Mr. Adams's First Amendment claims regarding the alleged interference with his legal mail survive solely against Deputy Superintendent Contino, Captain Nottingham, Lieutenant Hugg, Sergeants Noelia Cruz and Kinkelin, and Corrections Officers Harrison, Keefe, Bromiley, and Labadie. All other First Amendment claims respecting interference with legal mail are dismissed.

Finally, Mr. Adams's procedural due process claims survive only with respect to Hearing Officer Dittman, Lieutenant Clayton, and Corrections Officers Butler and South.  We dismiss all other due process claims, against all other defendants.